**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
JAY GUSLER,

                                        Plaintiff *Pro Se*,                    **REPORT AND**
                                                                              **RECOMMENDATION**

                    - against -                                               CV 10-2077 (SJF) (AKT)

THE CITY OF LONG BEACH, THE LONG
BEACH VOLUNTEER FIRE DEPARTMENT,
THE LONG BEACH POLICE DEPARTMENT,
CHARLES THEOFAN, GARRET ROONEY,
LISA HIRSCH, COREY KLEIN, ROBERT
AGOSTISI, MARCO PASSARO, JOHN
GARGAN, SCOTT KEMINS, STEPHEN
FRASER, JOHN MCLAUGHLIN, MICHAEL
GELBERG, AND TIMOTHY RADIN,
individually and in their official capacities,

                                        Defendants.
-----------------------------------------------------------X

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

**I.     PRELIMINARY STATEMENT**

        Jay Gusler ("Plaintiff" or "Gusler"), appearing *pro se*, filed a Complaint against The City

of Long Beach ("City"), The Long Beach Volunteer Fire Department ("LBVFD"), Charles

Theofan, Lisa Hirsch, Corey Klein, Robert Agostisi, Marco Passaro, John Gargan, Scott Kemins,

Stephen Fraser, John McLaughlin, Michael Gelberg, and Tomothy Radin (collectively

"Defendants").[1]  Plaintiff is an employee of the City of Long Beach Fire Department ("LBFD"),

---

[1]      The Complaint also names as defendants The Long Beach Police Department and Garret
Rooney.  However, in his opposition to Defendants' motion to dismiss, Plaintiff indicates that he
withdraws his Complaint as to these two Defendants.  DE 23 at 2.  As such, the claims brought
against these two Defendants are not addressed in this Report and Recommendation.  It is
respectfully recommended to Judge Feuerstein that Plaintiff be granted leave to amend the
caption of the case accordingly.

which is alleged to be an agency of the City.  Plaintiff brings this action pursuant to 42 U.S.C.

§ 1983 for alleged deprivations of Plaintiff's rights under the First and Fourteenth Amendments

and under 42 U.S.C. § 1985(3) and § 1986.  Plaintiff also brings four state causes of action.

Defendants have now moved to dismiss the Complaint.  DE 21.  Plaintiff has filed opposition to

the motion.  DE 23.

This motion has been referred to me by Judge Feuerstein for a Report and

Recommendation.  Based on my review of the Complaint, the arguments advanced by both

parties in their written submissions, and the applicable case law, I respectfully recommend to

Judge Feuerstein that Defendants' motion to dismiss be GRANTED in part and DENIED in part.

## II.    FACTUAL BACKGROUND

The following background facts come from the Complaint [DE 1].  Plaintiff has been a

firefighter with the LBFD since 1993.  DE 1 ¶ 58.  Plaintiff was promoted to Lieutenant in the

LBFD in 1999.  *Id.* ¶ 59.  Plaintiff is also a member of the Uniformed Firefighters Association

("UFA"), the union representing the paid firefighters, and Plaintiff has at times held various titles

on the Executive Board of that union.  *Id.* ¶ 60.  The LBFD is comprised of both paid firefighters,

such as Plaintiff, and members of the LBVFD, who are unpaid.  *Id.* ¶ 26.  At the time of the

filing of the Complaint, the LBFD was purportedly comprised of 26 paid firefighters and 106

volunteer firefighters.  *Id.*  The individual Defendants are employees of the City and/or LBVFD

in various capacities, which will be discussed *infra*.  Throughout Plaintiff's career with the

LBFD, he has been outspoken in his criticism of the way the volunteer firefighters are recruited

and trained, and the way the LBFD as a whole has been run.  Based in part on his speech

concerning this issue, Plaintiff alleges that Defendants have taken retaliatory action against him.

### A.   Plaintiff's 2008 Statements Regarding Overtime Staffing

During 2008, the UFA had been engaged in an effort to bolster the number of paid firefighters who worked overtime during summer weekends, a busy time for the LBFD.  *Id.* ¶¶ 84-86.  Plaintiff had been appointed to the position of Executive Officer ("XO") of the paid firefighters in April 2008.  *Id.* ¶ 73.[2]  The Complaint alleges that although "it was not within his duties to do so," Plaintiff became involved in the overtime staffing dispute in an effort "to convince the City of the importance of this additional staffing."  *Id.* ¶ 87.

Plaintiff first met with Garret Rooney, who, at the time, was the Assistant City Manager.  *Id.* ¶ 13.  Rooney told Plaintiff that the City did not find it necessary to provide additional staffing, but that Plaintiff could bring it up with the City Manager, Defendant Charles Theofan.  *Id.* ¶ 88.  Plaintiff wrote a letter to Defendant Theofan describing the "dire state" of the volunteer firefighters' performance and referenced two recent incidents during which the "volunteers failed to get out at all for a cardiac emergency and a seriously injured motorcyclist."  *Id.* ¶ 90.  The letter "warned of the consequences for the publics [sic] well being, as well as the PR nightmare and potential liability that would inevitably arise out of the excessive waiting times observed by the public at the scene of calls for help."  *Id.* ¶ 91.  The Court notes that while the exact date of this letter is not stated in the Complaint, it appears to have been written very shortly after Plaintiff's appointment to XO in April 2008, but before May 10, 2008.

The day after sending the letter, Plaintiff received a telephone call from Defendant Theofan stating that the City would not be changing its position and "chastis[ing] Plaintiff for

---

[2]      The Complaint states that Plaintiff was appointed to the position of XO in April *2009*. However, based on the chronology of events and the statements in the parties submissions, it appears that this is a typographical error and the date should read "April 2008."

having taken up the cause in the first place." *Id.* ¶ 93. Plaintiff alleges that the "City's management" shared the contents of his letter with the leadership of the LBVFD, who then "commenced a campaign of retaliation against" the paid firefighters, including Plaintiff. *Id.* ¶¶ 96-97.

As alleged examples of this retaliation, Plaintiff describes four incidents that occurred on May 10, 2008 and May 11, 2008. Plaintiff himself was present for only one of these incidents, while the rest are pled on information and belief. In the first incident, Plaintiff alleges that Defendant John Gargan, a member of the LBFD,[3] employed certain procedures in responding to a call that were not in the best interests of the public, but served "to spar[e] the LBVFD the embarrassment of again demonstrating its inadequate response capabilities." *Id.* ¶ 108. In the second incident, Plaintiff alleges that Defendant Marco Passaro,[4] a member of the LBFD, similarly employed procedures that left the paid firefighters and the public "in grave danger." *Id.* ¶ 128. When another paid firefighter asked Defendant Passaro why he had taken the actions he did, he allegedly replied, "If you guys want to write letters and handle all the EMS calls, I figured I'd let you." *Id.* ¶ 130. Plaintiff alleges that this was in reference to his letter to Defendant Theofan and is "an unmistakable admission of retaliatory motive." *Id.* ¶ 131.

The third allegedly retaliatory incident described by Plaintiff involved Defendant Passaro "improperly interfer[ing]" with the conduct of another LBFD crew in a way that urged the crew

---

[3]     The Complaint does not specifically state whether Defendant Gargan is a paid firefighter or a volunteer firefighter. However, given the entirety of the Complaint and the parties' submissions, it appears that Defendant Gargan is a volunteer firefighter.

[4]     The Complaint does not specifically state whether Defendant Passaro is a paid firefighter or a volunteer firefighter. However, given the entirety of the Complaint and the parties' submissions, it appears that Defendant Passaro is a volunteer firefighter.

to allegedly "commit malpractice" and take "negligent actions" that were contrary to the best interests of the patient involved.  *Id.* ¶¶ 138-39.  The fourth incident, and the only one personally witnessed by Plaintiff, involved Defendant Gargan "berating" Plaintiff for the placement of his truck at the scene of an emergency call.  Plaintiff alleges that his truck's placement was proper and that Defendant Gargan's "tirade" was "in retaliation for Plaintiff's letter" to Defendant Theofan.  *Id.* ¶ 146.

### B.        Plaintiff's May 13, 2008 Letter Regarding Alleged Misconduct

In response to these four incidents, Plaintiff drafted a letter "outlining the misconduct of the Chiefs in direct response to Plaintiffs [sic] letter to Defendant Theofan."  *Id.* ¶ 148.  The letter argued that the Chiefs should be suspended and then dismissed from the LBFD for their conduct during the four described incidents.  *Id.*  Plaintiff ultimately  intended to send the letter to the Fire Commissioner, Defendant Stephen Fraser,[5] but first sent a draft to Assistant City Manager Rooney on May 13, 2008.  *Id.* ¶¶ 148-49.  Plaintiff did not receive a formal response to his letter from Assistant City Manager Rooney.  However, a few days after sending the letter, Plaintiff ran into Mr. Rooney in City Hall and asked him if he had received the letter.  Mr. Rooney said he had reviewed the letter.  Mr. Rooney then stated that he and Defendant Theofan were "reconsidering their decision to appoint Plaintiff to the title of XO because of Plaintiff's 'attitude' toward the volunteers."  *Id.* ¶ 150.  After this statement, Plaintiff decided not to forward his letter to the Fire Commissioner.

---

[5]        The Complaint does not specifically state whether Defendant Fraser is a paid firefighter or a volunteer firefighter.  However, given the entirety of the Complaint and the parties' submissions, it appears that Defendant Fraser is a volunteer firefighter.

### C. Plaintiff's 2008 Statements in Opposition to the Seizure of UFA's Computer

In July 2008, the City received a complaint regarding an allegedly harassing and offensive posting regarding a member of UFA which he posted to the website "craigslist.com". *Id.* ¶ 152-54. Plaintiff was asked to attend a meeting, in his capacity as XO, to discuss the issue. *Id.* ¶ 155. Defendant Theofan was present at this meeting, as was the Corporation Counsel, Defendant Corey Klein, and the Assistant Corporation Counsel, Defendant Robert Agostisi. Defendant Klein allegedly stated that the City "knew" that the offensive posting was made from the UFA computer in the fire headquarters. *Id.* ¶ 157. Thus, Defendant Klein "ordered that Plaintiff seize the computer" and deliver it to a forensics firm for analysis. *Id.* Plaintiff stated that he believed the UFA computer was "off limits to the City" and that he had "grave concerns about the legality of what he was being ordered to do." *Id.* ¶ 159. Plaintiff alleges that Defendant Klein used false information to compel Plaintiff to seize the computer. *Id.* ¶ 161.

### D. Plaintiff's October 2008 Letter Regarding Training

In early October 2008, the UFA arranged to have the paid firefighters attend a "live-burn" training at the Nassau County Fire Service Academy. Plaintiff alleges that the paid firefighters had not attended this training in three years because the City refused to pay overtime for the hours required to complete the training. *Id.* ¶¶ 166-67. Plaintiff wrote a memorandum to Defendant Fraser apprising him of the training dates and informing him of what equipment would be needed. *Id.* ¶ 168. Plaintiff received no response to the memorandum. *Id.* Plaintiff then informed Defendant Theofan of the training and requested permission to use certain equipment. *Id.* The Complaint states that Defendant Theofan "expressed reservations about the overtime" that the training would require. *Id.* ¶ 169. After Plaintiff provided documentation

stating that the training was mandatory, Defendant Theofan said he would take it under advisement. *Id.* As the date of the training neared, Plaintiff approached Defendant Theofan to ask if the training would be approved. Defendant Theofan stated that the training would not be approved because of the costs involved. *Id.* ¶ 170.

Plaintiff then wrote a letter to Defendant Theofan, which he intended to send to the entire City Council, stating that he was "disappointed that Theofan would put dollars above the safety of the members of the UFA." *Id.* ¶ 171. Before sending the letter to the City Council, Plaintiff sent a copy to Defendant Theofan. Upon receiving the letter, Defendant Theofan telephoned Plaintiff and asked if copies had already been sent to the City Council. Plaintiff stated that they had not. *Id.* ¶ 172. Defendant Theofan allegedly told Plaintiff to "'withdraw the letter' or he would remove Plaintiff from the title of XO." *Id.* ¶ 173. "Under duress," Plaintiff agreed not to send the letter. *Id.*

### E.    Plaintiff's Statements at the November 2008 Fire Board Meeting

The policy-making body of the LBFD is the Board of Fire Commissioners ("Fire Board"), which is comprised of the Fire Commissioner, the Deputy Fire Commissioner, the Chief of the LBVFD, a City Council member and the XO. *Id.* ¶ 50. In November 2008, a Fire Board meeting was held, which Plaintiff attended. One of the agenda items at that meeting was a proposal to reduce the coverage of the paid firefighters during certain hours. *Id.* ¶ 176. In advance of the meeting, Plaintiff compiled a "substantial quantity" of materials that supported an expansion of paid firefighter coverage, rather than a reduction. *Id.* ¶ 178.

The meeting was chaired by Defendant Theofan, although Plaintiff alleges that the Fire Commissioner was supposed to chair the Fire Board meetings. *Id.* ¶ 180. A discussion was had

regarding the "live burn" training that the paid firefighters had not been allowed to attend. The Complaint alleges that the Defendants present at the meeting stated that the paid firefighters should agree to participate in the training without being compensated, and Plaintiff "beat down" that suggestion. *Id.* ¶ 184. When the discussion turned to the agenda item regarding a potential reduction in paid firefighter coverage, Defendant Theofan stated that the proposal would not actually be discussed due to time constraints, but would be taken up at a future meeting. *Id.* ¶¶ 187-90. Plaintiff protested that he had "spent weeks" preparing for the discussion and thought the topic "too important to be put off to another day." *Id.* ¶ 190. However, the meeting was adjourned without a discussion of paid firefighter staffing. Plaintiff alleges that by cutting off the discussion, Defendants "stifled" his opposition.

### F.    The 2008 Christmas Staffing Controversy

One of Plaintiff's duties as XO was to determine the staffing assignments of LBFD employees. *Id.* ¶ 194. In December 2008, Plaintiff was notified by Lieutenant O'Dowd, who was scheduled to work on Christmas Eve, that Lieutenant O'Dowd would be taking vacation that day. *Id.* ¶ 196. After determining that there was a Lieutenant who had never worked over the Christmas holiday, Plaintiff telephoned that Lieutenant, Lieutenant Alfasi, and informed him that he would be ordered to work Christmas Eve. *Id.* ¶¶ 197-98. Lieutenant Alfasi allegedly told Plaintiff that he refused to work that day and would call in sick if so ordered. *Id.* ¶ 199. After a heated discussion, Plaintiff decided to discipline Lieutenant Alfasi for his behavior. *Id.* ¶ 201. Plaintiff then telephoned Defendant Theofan to inform him of the incident and that he intended to discipline Lieutenant Alfasi. *Id.* ¶ 202. Defendant Theofan allegedly suggested other courses

of action that Plaintiff take to resolve the Christmas Eve staffing issue and the two men argued. *Id.* ¶¶ 203-05.

On December 12, 2008, Defendant Theofan sent a memorandum to Plaintiff instructing him to deny the request for vacation to Lieutenant O'Dowd. Defendant Theofan further instructed Plaintiff to "ignore" Lieutenant Alfasi's behavior, stating that Plaintiff should not have asked him to work that day. *Id.* ¶ 206. Based on this memorandum, Plaintiff "came to believe" that Defendant John McLaughlin, a city council member, had intervened on Lieutenant Alfasi's behalf. *Id.* ¶ 207. Thus, Plaintiff called Defendant McLaughlin and left him a voicemail message regarding Plaintiff's "suspicion of McLaughlin's involvement." *Id.* ¶ 208. Defendant McLaughlin then telephoned Plaintiff and "unleashed a withering, expletive filled tirade upon [Plaintiff]." *Id.*

Plaintiff then devised a plan that would require Lieutenant Alfasi to work on Christmas Eve while not disobeying Defendant Theofan's memorandum. Plaintiff decided that he would transfer the Lieutenants to different groups so that Lieutenant Alfasi would be in the group already assigned to work on Christmas Eve. *Id.* ¶¶ 211-12. When Plaintiff informed Defendant Theofan of this plan, Defendant Theofan told Plaintiff "not to take this action and reiterated that Lt. Alfasi was not to have any disciplinary action taken against him. . ." *Id.* ¶¶ 212-13. Plaintiff stated that "transfers within the Uniformed Force was [sic] his exclusive province and that he did not believe Theofan was in position [sic] to usurp his authority over such matters." *Id.* ¶ 241. Shortly after this exchange, Plaintiff received a memorandum from Defendant Theofan memorializing their discussion. Plaintiff proceeded with the transfers, which he felt were appropriate. *Id.* ¶ 216.

On December 15, 2008, Plaintiff sent a letter to Defendant Theofan memorializing his views on the issue and criticizing the way that Defendant Theofan handled the situation. *Id.* ¶ 219. The Complaint states that this letter was written by Plaintiff "in his capacity as a private citizen . . .[i]t was not written pursuant to Plaintiffs [sic] official duties." *Id.* ¶ 221.

### G. Plaintiff's Removal as XO and December 2008 Disciplinary Charges

On December 16, 2008, Plaintiff received a memorandum from Defendant Theofan informing Plaintiff that he was being removed from the position of XO. *Id.* ¶ 223. The memorandum further rescinded all of Plaintiff's "proscribed" actions, and put Plaintiff on notice of an impending disciplinary action. *Id.* ¶ 224. On December 29, 2008, Plaintiff was brought up on disciplinary charges, which he alleges were "in direct response to his constitutionally protected speech on matters of public concern." *Id.* ¶ 225.

### H. Plaintiff's February 2009 Workplace Violence Complaint

On February 11, 2009, Plaintiff was part of an LBFD team that responded to the scene of a reported house fire. While inside the house, Plaintiff heard loud yelling over his radio and went outside to investigate. *Id.* ¶ 234. Plaintiff observed Defendant Passaro yelling at members of Plaintiff's crew. Plaintiff intervened and Defendant Passaro "directed his attack" at Plaintiff. *Id.* ¶ 236. Plaintiff walked away from Defendant Passaro in order to finish his work in the building. *Id.* ¶ 237. When he was done in the building, Plaintiff approached Defendant Passaro and was "met with a continuation of the earlier angry exchange between the two." *Id.* ¶ 239. As Plaintiff got nearer to Defendant Passaro, he detected the smell of alcohol on Defendant Passaro's breath and concluded that Defendant Passaro was intoxicated. *Id.* ¶ 240. At some point during the exchange, Defendant Passaro allegedly lunged at Plaintiff and said he would "kick [Plaintiff's]

ass." *Id.* ¶ 241. Members of the LBVFD and police officers on the scene intervened and restrained Defendant Passaro. *Id.* ¶ 242.

Plaintiff retreated to his truck. However, after "approximately thirty seconds" of contemplation, Plaintiff decided to report his suspicion of Defendant Passaro's intoxication. *Id.* ¶ 244. Plaintiff approached two members of the Long Beach Police Department ("LBPD") who were at the scene, Defendants Michael Gelberg and Timothy Radin. Plaintiff asked if the officers realized Defendant Passaro was drunk, to which Defendant Gelberg replied "This is firehouse bullshit! Don't get us in the middle of it! Take it back to the firehouse!" *Id.* ¶ 246.

Plaintiff returned to fire headquarters and telephoned the LBPD to ask how he could document the incident and report Defendant Passaro's intoxication. *Id.* ¶ 250. Plaintiff was told to come to the station to complete an event report. *Id.* Shortly thereafter, Plaintiff arrived at the police station where he was "ushered into an office" with Defendant Gelberg. Plaintiff was asked only the time and location of the incident. All other information on the event report was allegedly provided by Defendant Gelberg. *Id.* ¶ 251. When Plaintiff obtained a copy of the report he was "shocked" to find that it did not comport with his memory of the incident. *Id.* ¶ 253. The Complaint alleges that the LBPD refused to investigate Plaintiff's allegation that Defendant Passaro was intoxicated, thus allowing "a possibly intoxicated individual to take the road endangering the motoring public and the members of the LBFD." *Id.* ¶ 254. Plaintiff alleges that Defendant Gelberg refused to investigate the complaint because his father was a member of the LBVFD. *Id.* ¶¶ 262-64. Plaintiff further alleges that Defendant Gelberg had previously ignored a similar complaint concerning Defendant Passaro's alleged drunkenness made by another paid firefighter in 2008. *Id.* ¶ 264. As such, Plaintiff alleges that Defendant

Gelberg's repeated conduct demonstrates "an institutional willingness to overlook misconduct or illegality by members of the Defendant LBVFD." *Id.* ¶ 265. Plaintiff further alleges that the "LBPD is unwilling to enforce the law when the complaining party is a UFA member." *Id.* ¶ 266.

On the night of the February 11, 2009 incident, Plaintiff drafted a Workplace Violence complaint pursuant to the City's Workplace Violence Prevention Act ("WVPA"). Plaintiff sent copies of his complaint to Defendant Fraser and Defendant Theofan. *Id.* ¶ 268.

The next day, Plaintiff had a discussion with the firefighter who had replaced him as XO. The new XO informed Plaintiff that he had been told by Defendant Passaro that Defendant Passaro would "see Jay off his job." *Id.* ¶ 270.

On February 13, 2009, Defendant Theofan allegedly discussed the February 11 incident with the UFA president. Defendant Theofan allegedly told the UFA president that Plaintiff had improperly placed his truck at the scene of the fire, which is why Defendant Passaro had yelled at him. *Id.* ¶ 272. On that same day, Plaintiff telephoned Defendant Klein to discuss the February 11 incident, but Defendant Klein stated he had no knowledge of the matter. *Id.* ¶ 280. Plaintiff urged Defendant Klein to discipline Defendant Passaro pursuant to his WVPA complaint. Defendant Klein stated that any such disciplinary action was discretionary under the WVPA. *Id.* ¶¶ 282-83. Plaintiff informed Defendant Klein that he feared for his safety if he had to continue to serve with Defendant Passaro. *Id.* ¶¶ 283-84.

Having concluded that the City was not going to take action on his WVPA complaint, Plaintiff filed a complaint with the Department of Labor Public Employee Safety and Health Bureau ("DOL PESH") on February 17, 2009. *Id.* ¶ 286. Plaintiff then wrote a memorandum to

the City advising that he had filed the DOL complaint and reiterating that he feared for his safety "absent the suspension of Passaro." *Id.* ¶ 288. This memorandum was delivered to Plaintiff's immediate supervisor. The memorandum also stated Plaintiff's position that the City was not appropriately complying with the WVPA (an argument Plaintiff details in the Complaint, *see id.* ¶¶ 328-40), and described threats Defendant Passaro had made against Plaintiff since the February 11 incident. *Id.* ¶¶ 289-90. At the conclusion of his memorandum, Plaintiff stated that he would be "refusing to come to work until something is done that addresses Plaintiffs [sic] fears for his safety." *Id.* ¶ 291.

Defendant Theofan wrote a memorandum in response to Plaintiff's memorandum, which stated that Plaintiff's WVPA complaint was being forwarded to Defendant Lisa Hirsch, an Assistant City Manager, for review. Defendant Theofan also stated that he believed Plaintiff's fears regarding Defendant Passaro to be unfounded and that Plaintiff would be subject to disciplinary action if he were to take any unauthorized absences. *Id.* ¶ 293. A few days after receiving this memorandum from Defendant Theofan, Plaintiff was informed that a copy of Defendant Theofan's memorandum had been posted in various locations around fire headquarters. *Id.* ¶ 294. Plaintiff alleges that this violates the City's policy to keep WVPA complaints confidential. *Id.* ¶ 337. Plaintiff states that "it is indisputable" that Defendant Passaro posted the copies. *Id.* ¶ 295. Plaintiff informed the Assistant Corporation Counsel, Defendant Robert Agostisi that the memorandum had been posted, and Defendant Agostisi took no action. *Id.* ¶ 298.

On February 24, 2009, Plaintiff met with Defendant Hirsch regarding his WVPA complaint. As the interview proceeded, it became clear to Plaintiff that the subject of the

interview was not his complaint against Defendant Passaro, but instead the interview was focused on Plaintiff's actions on February 11 and whether he had followed proper "firematic" procedures. *Id.* ¶¶ 300-09.

On February 26, 2009, a DOL compliance officer met with Plaintiff regarding his DOL complaint. *Id.* ¶ 312. The compliance officer informed Plaintiff that he had already interviewed Defendant Theofan regarding the complaint, and Defendant Theofan had stated that the WVPA complaint was "an attempt by Plaintiff to draw attention away from his firematic 'mistakes' on the date of the incident in question." *Id.* ¶ 314. The Complaint also alleges that Defendant Klein sent a letter to the DOL expressing similar viewpoints. *Id.* ¶ 318. Additionally, Defendant Theofan allegedly told Plaintiff's union representative that he "was not happy" about the DOL complaint and that he "couldn't believe Jay would do this." *Id.* ¶ 316. Ultimately, Plaintiff's DOL complaint was not sustained and is under appeal to the New York State Board of Industrial Appeals. *Id.* ¶ 323. Plaintiff asserts that Defendants' actions in delaying the appeal have deprived Plaintiff of his constitutional right to petition his government. *Id.* ¶ 325. Plaintiff further asserts that Defendants' actions regarding the DOL complaint denied Plaintiff "equal protection of the laws of this State intended to promote safety in his workplace." *Id.* ¶ 327.

The final report on Plaintiff's WVPA claim was prepared by Defendant Hirsch and dated April 21, 2009. However, Plaintiff did not receive a copy of the report until November 2009. *Id.* ¶ 343.

## I.  March 10, 2009 Disciplinary Charges

Plaintiff was brought up on disciplinary charges on March 10, 2009 in connection with the events of February 11, 2009 – the same events on which he based his WVPA and DOL

complaints. Plaintiff alleges that these charges are in direct retaliation for his filing the complaints. *Id.* ¶¶ 348, 395. Plaintiff further alleges that Defendant Scott Kemins,[6] the First Deputy Commissioner of the LBFD, was responsible for making the decision to bring these disciplinary charges. *Id.* ¶¶ 397-400. These disciplinary charges also involved actions taken by Plaintiff on February 3, 2009 - eight days before Plaintiff's confrontation with Defendant Passaro. *Id.* ¶ 396. Plaintiff alleges that this charge was added by the Defendants in order to give legitimacy to the other retaliatory charges. *Id.* ¶ 404.

On January 21, 2010,[7] a hearing officer attempted a mediation regarding the disciplinary charges. The City insisted that Plaintiff forfeit his right to a private action, which Plaintiff refused to do. *Id.* ¶ 411. As such, the mediation was unsuccessful. A disciplinary hearing was held on these charges on February 8, 2010. The charge relating to the February 3 incident was dismissed as untimely. *Id.* ¶ 402. The hearing on the February 11 incident was continued, but has not been rescheduled by the City. *Id.* ¶ 406.

Plaintiff alleges that the Defendants further retaliated against him for filing the WVPA and DOL complaints by denying Plaintiff's requests for leave and docking his pay for leave that was not properly approved. *Id.* ¶ 365, 378. Plaintiff asserts that he was treated differently in this regard from the other firefighters who were not denied leave or subject to pay-docking in similar

---

[6]     The Complaint does not specifically state whether Defendant Kemins is a paid firefighter or a volunteer firefighter. However, given the entirety of the Complaint and the parties' submissions, it appears that Defendant Kemins is a volunteer firefighter.

[7]     The Complaint states that these events took place on January 21, *2009*. *Id.* ¶ 409. However, given the sequence of events, it appears this is a typographical error and was meant to read January 21, 2010, which is the date Plaintiff references for these events later in the Complaint. *Id.* ¶ 480.

circumstances.  Finally, Plaintiff alleges that he was put under surveillance by Defendants on three dates that he called in sick, whereas other firefighters were not put under surveillance when they called in sick.  *Id.* ¶¶ 387-89.  Plaintiff alleges that while he believes these retaliatory actions were taken primarily due to his WVPA and DOL complaints, "it is suggested that the totality of Plaintiffs [sic] actions has been a factor in the Defendants motives."  *Id.* ¶ 391.

**J.      Plaintiff's May 2009 Internet Postings**

Plaintiff has been a frequent participant in discussion forums on the website "theschwartzreport.com."  Many of these discussions have concerned the LBFD.  *Id.* ¶ 431.  In May 2009, during a discussion concerning alleged misconduct of certain members of the LBVFD, Plaintiff posted that "three of the last four volunteer Chiefs of the LBFD all had criminal records."  *Id.* ¶ 438.  Plaintiff then posted the criminal backgrounds of these individuals. The posts did not mention the volunteer firefighters by name, but did include their dates of birth. *Id.* ¶¶ 439-40.

In response to these posts, Plaintiff became the target of abusive and threatening posts from other users on the website.  Plaintiff alleges that the content of these posts made it clear that they were written by volunteer firefighters.  Plaintiff filed a complaint regarding these posts with the Nassau County District Attorney's Office.  Plaintiff discussed the threats with Defendant Theofan and Defendant Agostisi and Defendant Theofan suggested that Plaintiff take some time off to allow things to "cool off."  *Id.* ¶ 445-46.  Thereafter, Plaintiff then made a WVPA complaint to Defendant Hirsch.  *Id.* ¶ 447.  Plaintiff states that no action was taken on these complaints.

## K.    The December 19, 2009 "Nozzle Switching" Incident

On December 19, 2009, Plaintiff alleges that Defendant Passaro changed the nozzle on a fire hose in the fire headquarters where the paid firefighters are stationed. *Id.* ¶ 462-63. Plaintiff alleges that this act created "a significant burn hazard to the firefighters operating that hose." *Id.* ¶ 468. Defendant Gargan allegedly caught Defendant Passaro making this switch, and directed Defendant Passaro to stop. *Id.* ¶ 472. The Complaint asserts that Defendant Agostisi stated disciplinary action would not be taken against Defendant Passaro until after Defendant Passaro testified against Plaintiff in Plaintiff's disciplinary action. *Id.* ¶ 481. It appears that no disciplinary action was ever taken against Defendant Passaro for this incident. *Id.* ¶ 482.

## L.    April 20, 2010 Disciplinary Charges

In part as a result of Plaintiff's WVPA and DOL complaints, a workplace violence training was scheduled for LBFD firefighters on April 8, 2010. *Id.* ¶ 489. Plaintiff was scheduled to be on leave during the time of this training and when he discussed this with his superiors, he was told that he could not do the training when he was not on duty as overtime would not be paid for attendance at the training. *Id.* ¶ 493. Plaintiff decided to go to the training on April 8 on his own time even though he would not be compensated. *Id.* ¶ 494. However, once Plaintiff arrived at the training and reviewed the handout, he determined that he had seen this material previously and that the training was nothing more than "window dressing." *Id.* ¶ 496. Plaintiff decided to leave the training before the lecture began. *Id.*

Ten minutes after leaving the training, Plaintiff received a telephone call from Defendant Theofan ordering Plaintiff to return to the seminar. *Id.* ¶ 498. Plaintiff stated that he was off-duty, but Defendant Theofan nevertheless ordered him to return. *Id.* ¶ 499. Plaintiff offered to

go to one of the other seminars later that day and Defendant Theofan agreed. *Id.* ¶ 500. Plaintiff arrived fifteen minutes late to the later seminar because he was mistaken about the time the seminar started. *Id.* ¶ 501.

On April 20, 2010, Plaintiff was served with disciplinary charges arising out of his behavior in regards to the seminars. Plaintiff was also suspended without pay. *Id.* ¶ 503. Plaintiff alleges that these disciplinary measures were in retaliation of all his prior complaints regarding the LBFD. *Id.* ¶ 506.

## III. STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006). The plaintiff must satisfy "a flexible plausibility standard." *Iqbal v. Hasty*, 490 F.3d 143, 157 (2d Cir. 2007), rev'd on other grounds. *Ashcroft v. Iqbal*, --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Court, therefore, does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

The Supreme Court recently clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, --- U.S. ----, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), setting forth a two-pronged approach for courts deciding a motion to dismiss. District courts are to first "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of

truth." *Iqbal*, 129 S.Ct. at 1950. Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*. Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 1949 (quoting and citing *Twombly*, 550 U.S. at 556-57) (internal citations omitted).

In addition, where, as here, a plaintiff is proceeding *pro se*, the pleadings must be considered under a more lenient standard than that accorded "formal pleadings drafted by lawyers." *Bellamy v. Mt. Vernon Hosp.*, 07 Civ. 1801, 2009 U.S. Dist. LEXIS 54141, at *13-14 (S.D.N.Y. Jun. 26, 2009) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). The pleadings must be "interpreted to raise the strongest arguments they suggest." *Bellamy*, 2009 U.S. Dist. LEXIS 54141, at *14 (quoting *Burgos v. Hopkins*, 14 F.2d 797, 790 (2d Cir. 1994)). This principle remains the case even after *Twombly* and *Iqbal*. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).

**IV.  DISCUSSION**

Defendants move to dismiss the Complaint on the grounds that: (1) this Court lacks personal jurisdiction; (2) the Complaint fails to state a claim as a matter of law; (3) the Complaint fails to state a claim against certain individual defendants; and (4) the individual defendants are protected by the doctrine of qualified immunity. Finally, Defendants argue that if

the Federal claims are dismissed, then the state law claims must be dismissed under the principles of supplemental jurisdiction.[8]

As an initial matter, the Court rejects Defendants' characterization that Plaintiff's First and Fourth Causes of Action are asserted against only the individual Defendants, whereas Plaintiff's Second and Third Causes of Action are asserted against only the municipal Defendants. DE 22-1 at 25. Defendants assert that "a review of the specific language chosen in each of the first four causes of action . . . necessarily indicates" this interpretation. However, reading the Complaint leniently, as the Court is required to do given Plaintiff's *pro se* status, I find that Plaintiff intended to bring all four of these causes of action against all Defendants. This view is supported by Plaintiff's assertions in his opposition papers. DE 23 at 13.

## A. <u>Personal Jurisdiction</u>

Defendants argue that this Court does not have personal jurisdiction over them because Plaintiff did not properly comply with Rule 4(l) of the Federal Rules of Civil Procedure, which provides that "unless service is waived, proof of service must be made to the court." Fed. R. Civ. P. 4(l)(1). Defendants do not cite any case law in support of this argument.

The Complaint in this action was filed on May 12, 2010. Summonses were issued to each Defendant on the same day. On September 9, 2010, the summons for each Defendant was entered on the docket as DE 5. Defendants first appeared in this action on September 13, 2011.

---

[8]     In his opposition papers, Plaintiff requests that the Court convert Defendants' motion to a motion for summary judgment and permit Plaintiff to take additional discovery pursuant to Rule 56(f). DE 23 at 1. The Court declines to convert the motion to a summary judgment motion as neither Defendants nor the Court have relied on any materials outside the Complaint. Furthermore, it appears that Plaintiff has the information necessary to oppose the motion to dismiss and does not need discovery in order to do so.

Defendants do not argue that service was not effected within the statutory period, nor do they argue that they were not adequately put on notice of this action within the statutory period. Defendants merely contend that because Plaintiff filed only copies of the summonses and not proofs of service, this Court did not acquire personal jurisdiction over Defendants.

After Defendants served their motion to dismiss upon the Plaintiff, Plaintiff filed affidavits of service showing that each Defendant was served within the statutory period. DE 16. Defendants do not address this argument in their subsequently filed reply brief. DE 24.

While Rule 4(l)(1) states that proof of service must be made upon the Court, this rule is tempered by Rule 4(l)(3), which provides that "failure to prove service does not affect the validity of service." Fed. R. Civ. P. 4(l)(3). Thus, the fact that Plaintiff belatedly filed proof of service does not render the service untimely or improper. *See Maier v. New York City Police Dep't*, No. 08-CV-5104, 2009 WL 2915211, at *4 (E.D.N.Y. Sept. 1, 2009) (finding that Defendant was properly served even though no proof of service was provided to the court); *See also Fifth Third Bank v. Mytelka,* No. 50-mc-52, 2008 WL 3852170, at *2 n.3 (E.D.N.Y. Aug. 16, 2008) ("Generally, the failure of the plaintiff to prove service of process does not necessarily affect the validity of service as the district court may permit proof of service to be amended under Fed. R. Civ. P. 4(l)(3)."). Accordingly, I respectfully recommend to Judge Feuerstein that Defendant's motion to dismiss based on a lack of personal jurisdiction be denied.

**B.**     **Retaliation Based on First Amendment Right to Freedom of Speech**

Defendants argue that Plaintiff's First cause of action, namely, retaliation based on Plaintiff's exercise of his First Amendment right to freedom of speech, must be dismissed because Plaintiff has failed to state a claim as a matter of law. The Second Circuit has explained

that the necessary elements to plead a First Amendment retaliation cause of action depend on the facts of the underlying matter. *See Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008). "It is well-established that the government, acting as an employer, may regulate the speech of its employees far more extensively than that of the general public." *DelBene v. Alesio*, No. 00-cv-7441, 2001 WL 170801, at *6 (S.D.N.Y. Feb. 21, 2001) (citing *Waters v. Churchill*, 511 U.S. 661, 671-72, 114 S.Ct. 1878, 1886, 128 L.Ed.2d 686 (1994)). "In order to establish a First Amendment retaliation claim, an employee must prove that: (1) he engaged in constitutionally protected speech; (2) he suffered an adverse employment action; and (3) the speech was a 'motivating factor' in the adverse employment decision." *Licopoli v. Mineola Union Free School Dist.*, No. 09-3974, 2010 WL 4961667, at *5 (E.D.N.Y. Dec. 1, 2010) (internal quotations omitted).

### 1.       *Whether Plaintiff Engaged in Protected Speech*

The determination of whether speech is protected is not a question of fact, but rather a question of law for the court. *See Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999); *see also Licopoli*, 2010 WL 4961667, at *5. In deciding whether a public employee is engaged in constitutionally protected speech, a court must determine "whether the employee spoke as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id.* If the answer is yes, a court must then determine "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.*; *see also Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir.2008).

In determining whether an employee speaks as a citizen or as an employee, the Supreme

Court has held that "when public employees make statements pursuant to their official duties, the

employees are not speaking as citizens for First Amendment purposes, and the Constitution does

not insulate their communications from employer discipline." *Garcetti,* 547 U.S. at 421. On the

other hand, "employees who make public statements outside the course of performing their

official duties retain some possibility of First Amendment protection because that is the kind of

activity engaged in by citizens who do not work for the government." *Id.* at 423. Whether an

employee acted in accordance with his official duties or acted as a citizen is a practical inquiry.

*Id.* at 424.

With respect to whether speech is a matter of public concern, a court must "take into

account the content, form and context of a given statement as revealed by the record as a whole."

*Licopoli*, 2010 WL 4961667, at *7 (citing *Ruotolo*, 514 F.3d at 189). In general, a statement

regards a matter of public concern where it is "of political, social, or other concern to the

community." *Hueston v. City of New York,* No. 00-cv-9512, 2005 WL 53256, at *6 (S.D.N.Y.

Jan. 10, 2005) (quoting *Connick v. Myers*, 461 U.S. 138, 146, 103 S. Ct. 1684, 75 L. Ed. 2d 708

(1983). However, "speech on a purely private matter, such as an employee's dissatisfaction with

the conditions of his employment, does not pertain to a matter of public concern." *Carpiniello v.

Hall*, No. 07-cv-1956, 2010 WL 987022, at *6 (S.D.N.Y. Mar. 17, 2010) (internal quotations

omitted). While the motive of the employee in making the statement "may be one factor" in

determining whether it is a mater of public concern, motive "is not, standing alone, dispositive or

conclusive." *Sousa v. Roque*, 578 F.3d 164, 175 (2d Cir. 2009).

It is within this framework that the Court must decide whether each incidence of Plaintiff's speech was protected by the First Amendment.

### a.    **Plaintiff's 2008 Statements Regarding Overtime Staffing**

Plaintiff explicitly states that it was not within his job duties to take up the issue of overtime staffing by meeting with Assistant City Manager Rooney and subsequently sending a letter on the subject to Defendant Theofan in 2008. DE 1 at ¶ 87. Defendants do not dispute this assertion. Instead, Defendants argue that these statements did not involve a matter of public concern because the issue was "a matter of personal interest to [Plaintiff], and constitutes efforts to secure money for himself, not to spark a public debate on issues involving Defendants' employment policies." DE 22-1 at 27. However, the fact that Plaintiff may have had a personal interest in the outcome of the issue does not preclude the speech from being a matter of public concern. *See Hueston,* 2005 WL 53256, at *7 (holding that even though plaintiff's statements encompassed, in part, his "personal problems with working conditions," his statements were a matter of public concern where they also "addressed an issue of fundamental importance to local government."). The Second Circuit has expressly stated that even where a person is "*motivated by* a personal grievance," they may still be speaking on a matter of public concern. *Sousa,* 578 F.3d at 174.

Plaintiff has made sufficient allegations to support the inference that his statements were motivated, at least in part, by a desire to protect the public from what Plaintiff viewed as an insufficient firefighting force. Keeping in mind that the Court, on a Rule 12(b)(6) motion, must accept the factual allegations set forth in the Complaint as true, one may reason that the residents of Long Beach would likely be interested to know that there were alleged deficiencies in the

performance of the volunteer firefighters and that the volunteers had failed to respond to emergencies on at least two occasions. Such matters concerning public safety and the purported adequacy and function of entities entrusted with protecting that safety are precisely the type of speech courts have held to be related to matters of public concern. *See Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 553 n.4 (2d Cir. 2001) (holding that "speech focused on the safety of young children at horse shows involving 4-H" was a matter of public concern); *Morris*, 196 F.3d at 111 (holding that police officers' speech concerning "crime rates, police staffing, equipment shortages and related budgetary matters quite plainly involve matters of public concern"); *Scheiner v. New York City Health & Hospitals*, 152 F. Supp. 2d 487, 496 (S.D.N.Y. 2001) (holding that physicians statements regarding conditions at public hospital were matters of public concern because they related to "issues of public health, safety, and the administration of public resources"). Accordingly, I find that for purposes of this motion to dismiss, Plaintiff has adequately pled that his statements in April and May of 2008 regarding UFA overtime staffing are protected speech under the First Amendment.

### b.     Plaintiff's May 13, 2008 Letter Regarding Alleged Misconduct

There is no statement in the Complaint as to whether the May 13, 2008 letter was written pursuant to Plaintiff's official duties as XO. It is worth noting, however, that Defendants have not asserted that the letter was written in accordance with Plaintiff's official duties. Reading the Complaint in the light most favorable to the Plaintiff for purposes of this motion, it appears that the letter was not written by Plaintiff in his official capacity. While Plaintiff ultimately intended to send his letter to the Fire Commissioner, he first went outside the chain of command and sent the letter to Assistant City Manager Rooney. This act provides a foundation for Plaintiff's

contention that he was not acting in his official capacity, but rather as a citizen. *See Licopoli*, 2010 WL 4961667, at *7 (stating that plaintiff acted as a citizen where he did not take his complaint up through the chain of command in his workplace). Furthermore, in Plaintiff's mind, this letter was written to outline conduct taken in response to his previous speech, which was made as a citizen. Thus, it is reasonable to conclude that the subsequent speech was also made as a citizen.

The subject of the letter was the alleged deficiencies in recent firefighter responses in Long Beach, including allegations of misconduct, malpractice and negligence. Such behavior within the fire department would be "of general interest and of value and concern to the public." *Licopoli*, 2010 WL 4961667, at *7. As such, the letter was on a matter of public concern. As discussed above, the fact that the letter also addressed Plaintiff's personal altercation with one of the firefighters does not remove it from the realm of public concern. Accordingly, I find that for the purposes of this motion to dismiss, Plaintiff has adequately pled that his May 13, 2008 letter regarding alleged misconduct in the fire department is protected speech under the First Amendment.

         **c.**       **Plaintiff's 2008 Statements in Opposition to the Seizure of UFA's Computer**

Plaintiff acknowledges that he was asked to attend, in his capacity as XO, the July 2008 meeting regarding the UFA computer. As such, his statements at that meeting concerning the seizure of the computer were made pursuant to his official duties and are not subject to First Amendment protection. *See Garcetti,* 547 U.S. at 424.

### d.     Plaintiff's October 2008 Letter Regarding Training

Once again there is no assertion in the Complaint that Plaintiff's speech urging the City to allow the paid firefighters to attend the "live burn" training was made in Plaintiff's official capacity as XO.  Defendants do not allege that this speech was made in Plaintiff's official capacity.  There is no allegation that the issue of determining which training firefighters attend was within the purview of the XO.  In light of these circumstances, and viewing the Complaint in the light most favorable to the Plaintiff, I find that the Plaintiff was acting as a citizen in his advocacy for attendance at the "live burn" training.

I further find that adequate training of firefighters and the expenditure of public funds to accomplish that training are matters of public concern.  *See Hueston,* 2005 WL 53256, at \*7 ("Plaintiff's statements addressed an issue of fundamental importance to local government - the use and misuse of public funds."); *Israel v. Abate*, 949 F. Supp. 1035, 1041 (S.D.N.Y. 1996) ("Issues of public concern protected by the First Amendment include public institutional policies, the integrity of governmental entities, breaches of public trust or the expenditure of public funds.").  This is especially true in light of the allegations that the training is mandatory and had not been attended in three years.  *See Morris*, 196 F.3d at 111.  As such, I find that for the purposes of this motion to dismiss, Plaintiff has adequately pled that his October 2008 statements and letter regarding the "live burn" training are protected speech under the First Amendment.

### e.     Plaintiff's Statements at the November 2008 Fire Board Meeting

The Complaint states that the XO is a member of the Fire Board.  Plaintiff attended the November 2008 Fire Board meeting in his official capacity as XO.  As such, Plaintiff's

statements at that meeting were made pursuant to his official duties and are not subject to First Amendment protection. *See Garcetti,* 547 U.S. at 424.

### f. The 2008 Christmas Staffing Controversy

Plaintiff admits that his statements and decisions regarding which firefighters would work on Christmas Eve were made in his official capacity as XO. However, Plaintiff alleges that the December 15, 2008 letter he subsequently wrote to Defendant Theofan criticizing the handling of the situation was written in Plaintiff's capacity as a private citizen and was not pursuant to any official duties. The Court need not decide this issue since the December 15, 2008 letter did not involve a matter of public concern.

Plaintiff argues that Defendants' alleged "illegal" and "political" means of handling the situation "imbued the matter with a public dimension." DE 23 at 24. However, "a public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run." *Ruotolo*, 514 F.3d at 190 (internal citations omitted). Unlike some of Plaintiff's other speech discussed above, Plaintiff's criticism of Defendants' actions regarding the holiday scheduling of firefighters does not implicate matters of public health, safety, or expenditures of public funds. The determination of which firefighters will work on a given day and how that determination is made has "no effect on the broader public and did not present a matter of public interest or debate." *Carpiniello*, 2010 WL 987022, at *6; *see also Shub v. Westchester Community College*, 556 F. Supp. 2d 227, 245 (S.D.N.Y. 2008) (holding that speech was not a matter of public concern where plaintiff was not attempting to "protect the public" and there was "no impact beyond the faculty members

involved."). For these reasons, Plaintiff's speech regarding the 2008 Christmas staffing controversy are not subject to First Amendment protection.

### g. Plaintiff's February 2009 Workplace Violence Complaint and DOL Complaint

Once again, the Court need not determine whether Plaintiff's speech regarding his WVPA complaint and his DOL Complaint was made as an employee, because the Court finds that these statements did not involve a matter of public concern. Plaintiff's filing of the WVPA complaint and the DOL complaint, as well as his memorandum to the City and any statements he made in connection thereto, concerned Plaintiff's personality conflict with a co-worker and Plaintiff's ability to continue to work with that individual. These are issues that concern only the individuals involved and do not implicate a matter of broader health, safety, or mismanagement of government resources such that the public would take an interest. *See Shub*, 556 F. Supp. 2d at 245; *see also Grennan v. Nassau Cnty,* No. 04-cv-2158, 2007 WL 952067, at *9 (E.D.N.Y. Mar. 20, 2007) (holding that plaintiff's complaint to DOL concerning working conditions and receipt of threatening letter were not matters of public concern but were "individual instances that affected her personally"). As such, Plaintiff's speech concerning his WVPA complaint, his DOL complaint, and his memorandum to the city on these matters are not subject to First Amendment protection.

However, Plaintiff's speech to the police officers and his filing of a complaint with the LBPD must be considered separately. Whereas grievance procedures under the WVPA and DOL regulations are intended to protect employees, making a complaint to a police department is the right of every citizen. By making such a complaint, Plaintiff was operating outside the normal

grievance procedures established by his employer. As such, I find that Plaintiff was acting as a citizen when making his statements to Defendants Gelberg and Radin and in making his formal complaint to the LBPD. *See Licopoli*, 2010 WL 4962667, at *7 ("Where a public employee takes his concerns to persons outside the workplace then those external communications are ordinarily not made as an employee, but as a citizen.") (citing *Williams v. Dallas Independent School Dist.*, 480 F.3d 689, 694 (5th Cir. 2007)). Furthermore, these statements concerned the alleged intoxication of a firefighter and Plaintiff's concern that the firefighter was endangering the public at large. Because this speech dealt directly with matters of public safety, I find it to be a matter of public concern. As such, I find that for the purpose of this motion to dismiss, Plaintiff has adequately pled that his statements to members of the LBPD are protected speech under the First Amendment.

### h.      Plaintiff's May 2009 Internet Postings

There is no indication in the record that Plaintiff's statements, made in a public internet forum, were made pursuant to his official job duties. Plaintiff was participating in a public conversation in which any citizen could have taken part. As such, Plaintiff's postings on the website were made in Plaintiff's capacity as a citizen. Furthermore, as the conversation occurred in a public forum and concerned a "recent spate of stories in the local news," it is evident that the matter was one of public concern. DE 1 ¶ 436. *See Snyder v. Phelps*, -- U.S. --, 131 S.Ct. 1207, 1216, 179 L.Ed.2d 172 (2011) ("Speech deals with matters of public concern . . . when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.") (internal quotations omitted). As such, Plaintiff has sufficiently alleged that his May 2009 internet postings are protected by the First Amendment.

Furthermore, for the reasons discussed above regarding Plaintiff's statements to the LBPD, I find that Plaintiff's statements to the Nassau County District Attorney's Office are protected by the First Amendment. However, for the reasons stated above regarding Plaintiff's prior WVPA complaint, his WVPA complaint concerning the internet postings are not protected speech.

### 2. Whether Defendants Were Entitled to Regulate Plaintiff's Protected Speech

The determination that some of Plaintiff's speech is protected by the First Amendment does not end the inquiry. In certain circumstances, public employers are entitled to regulate the protected speech of their employees. As the Supreme Court stated in *Pickering v. Board of Education*:

> The State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with the regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interest of the [public employee], as a citizen in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968).

This balancing test is known as the "Pickering balancing test," and presents a question of law which the court must resolve. *Locurto v. Safir*, 264 F.3d 154, 166 (2d Cir. 2001). This test necessitates the Court weighing Plaintiff's right to free speech against the Defendants' right to efficiently function without disruption or "personal friction." *See Janusaitis v. Middlebury Volunteer Fire Dep't*, 607 F.2d 17, 25 (2d Cir. 1979); *see also Locurto*, 264 F.3d at 166. Under the Pickering balancing test, a government employer may take adverse action against an

employee for speaking as a citizen on a matter of public concern if "(1) the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech." *Shanks v. Vill. of Catskill Bd. of Trs.*, 653 F. Supp. 2d 158, 168 (N.D.N.Y. 2009).

In applying this balancing test, courts may consider "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (internal citations omitted). Further, "[t]he 'manner, time, and place' in which the speech occurs is important in determining whether it is protected." *Lewis v. Cowen*, 165 F.3d 154, 162 (2d Cir. 1999). "For example, the *Pickering* balance is more likely to favor the government when an employee directly confronts his supervisor with objectionable language than when an employee engages in equivalent speech on his own time and not in front of co-workers." *Id.* "The weight afforded each side of the *Pickering* balance also varies with the content of the speech. The more the employee's speech touches on matters of significant public concern, the greater the level of disruption to the government that must be shown." *Id.*

The analysis under *Pickering* is a "fact-sensitive inquiry." *Kelly v. Huntington Union Free Sch. Dist.*, 675 F. Supp. 2d 283, 298 (E.D.N.Y. 2009). Furthermore, "the government has the burden of showing that despite First Amendment rights the employee's speech so threatens

the government's effective operation that discipline of the employee is justified." *Melzer v. Bd. of Educ.*, 336 F.3d 185, 193 (2d Cir. 2003).

The Court notes that the Second Circuit has held that a fire department has a strong interest in maintaining efficiency and preventing disruption. "When lives may be at stake in a fire, an Esprit de corps is essential to the success of the joint endeavor. Carping criticism and abrasive conduct have no place in a small organization that depends upon common loyalty [and] harmony among coworkers." *Janusaitis*, 607 F.2d at 26. However, Plaintiff's statements likewise must be accorded a high degree of protection since Plaintiff's complaints "went to the very heart of the [fire department's] ability to effectively and safely perform its public function." *See Shanks,* 653 F. Supp. 2d at 169.

In the present case, Defendants argue that Plaintiff's speech caused "dissent within the ranks." DE 22-1 at 34. However, Defendants do not provide any examples of how this dissent manifested, other than allegations made in the Complaint. Nor do Defendants indicate how such alleged dissent interfered with the efficiency of the LBFD. Thus, at this early stage of the litigation, "the Court cannot determine whether plaintiffs' speech was disruptive or whether the harm caused by the disruption outweighed plaintiffs' interest in the speech." *Kelly*, 675 F. Supp. at 298 (E.D.N.Y. 2009). As such, there is no basis at this time on which to dismiss Plaintiff's free speech claim based on the *Pickering* balancing test.

### 3.       *Adverse Employment Action*

Having determined that some of Plaintiff's speech is protected by the First Amendment, the Court must ascertain whether Plaintiff has sufficiently pled that an adverse employment action has been taken against him. In order to show that the plaintiff experienced an adverse

employment action, the Plaintiff must demonstrate that the Defendants took an action against him that "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Burhans v. County of Putnam*, No. 06-cv-8325, 2011 WL 1157693, at *4 (S.D.N.Y. Mar. 25, 2011) (citing *Anemone v. Metropolitan Transp. Authority*, 620 F.3d 97, 120 n.14 (2d Cir. 2011)). This standard has been described as "broad" and recognizes that an "adverse employment actions can take a wide variety of forms." *Anemone*, 620 F.3d at 120 n.14. A plaintiff is not "required to show that the defendants' action had an actual chilling effect." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 226 n.2 (2d Cir.2006) (internal citations omitted). Indeed, "[it] is well settled that public employees alleging retaliation for engaging in protected speech are not normally required to demonstrate a chill subsequent to the adverse action taken against them." *Morrison v. Johnson*, 429 F.3d 48, 51 (2d Cir. 2005) (internal quotations omitted). In addition, "whether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination." *Hoyt v. Andreucci*, 433 F.3d 320, 328 (2d Cir. 2006). "A plaintiff cannot support such a determination unless he can show that an alleged act of retaliation is more than de minimis." *Zelnik,* 464 F.3d at 226.

Plaintiff alleges that in retaliation for his speech, Defendants brought him up on three sets of disciplinary charges, demoted him from his position as XO, suspended him without pay, and docked his pay for approved leave. These allegations are sufficient to state an adverse employment action. *See Zelnik*, 464 F.3d at 226 ("adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand") (quotations omitted); *Rolon v. Ward*, 345 Fed. Appx. 608, 610 (2d Cir. 2009) (Summary Order) ("Being forced to defend against disciplinary charges may constitute an adverse employment

34

action."); *Burhans*, 2011 WL 1157693, at *4 (holding that allegations of denial of overtime pay previously received, official reprimands, and placement on involuntary leave were sufficient to allege adverse action for First Amendment retaliation claim).

Plaintiff alleges a multitude of additional actions that he claims were taken as retaliation for his protected speech. These include denial of requests for vacation, threatening behavior or verbal abuse from other firefighters, refusal to allow Plaintiff to speak at meetings, ignoring firematic procedure, and others. While these actions may be *de minimis* if taken alone, "a combination of seemingly minor incidents over a period of time may give rise to a First Amendment retaliation claim once the incidents reach a critical mass." *Rolon*, 345 Fed. Appx. at 610 (citing *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002); *see also Shanks*, 653 F. Supp. 2d at 166. The Court need not determine at this stage of the proceedings whether the minor acts alleged by Plaintiff constitute a "critical mass." Given that at least some of the adverse actions identified by Plaintiff "are sufficiently severe to support a First Amendment retaliation claim, it is unnecessary at this stage to determine whether each of them would independently support such a claim." *Burhans,* 2011 WL 1157693, at *5.

### 4. Causation

The final question remaining in determining whether Plaintiff has adequately pled a free speech retaliation claim is whether he has sufficiently alleged that there is a causal connection between his protected speech and the adverse employment actions. "The causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech." *Morris,* 196 F.3d at 110. "In this

Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Gorman-Bakos*, 252 F.3d at 554 (internal quotation omitted). Even absent temporal proximity, "evidence of an ongoing pattern of retaliatory conduct and intent can also establish a causal connection." *Shub*, 556 F. Supp. 2d 227, 246 (S.D.N.Y. 2008). "In addition, a plaintiff can also show retaliatory intent by establishing unequal treatment . . ." *Econ. Opportunity Comm'n of Nassau Cnty., Inc. v. Cnty. of Nassau,* 106 F. Supp. 2d 433, 437 (E.D.N.Y. 2000).

"The ultimate question of retaliation involves a defendant's motive and intent, both difficult to plead with specificity in a complaint." *Soundview Assoc. v. Town of Riverhead*, 725 F. Supp. 2d 320, 340 (E.D.N.Y. 2010) (internal citation omitted). At the pleading stage, "it is sufficient to allege facts from which a retaliatory intent on the part of the defendants reasonably may be inferred." *Id.*; *see also Gagliardi v. Village of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994) ("While a bald and uncorroborated allegation of retaliation might prove inadequate to withstand a motion to dismiss, it is sufficient to allege facts from which a retaliatory intent on the part of the defendants may reasonably be inferred."); *Sheppard v. Beerman*, 18 F.3d 147, 151 (2d Cir. 1994) ("The motive behind [plaintiff's] firing in his retaliation claim is clearly a question of fact. Because this question is in dispute, it was improper for the district court to answer it on a motion for dismissal on the pleadings.") (internal citation omitted). Indeed, Rule 9(b) of the Federal Rules of Civil Procedure provides that "malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

In the present case, Plaintiff has pled sufficient facts from which a reasonable inference can be drawn that actions taken by Defendants were motivated or substantially caused by Plaintiff's exercise of his First Amendment right to free speech. Plaintiff has alleged specific incidents of potentially adverse employment actions that occurred shortly afer his protected speech. Plaintiff has also given specific examples of derogatory remarks made by various Defendants which could reasonably indicate a retaliatory motive. These specific factual allegations could plausibly be viewed as a pattern of ongoing retaliatory conduct on the part of Defendants.

For these reasons, to the extent Plaintiff's First Cause of Action is based on retaliation for speech determined above to be protected, I respectfully recommend that Defendants' motion to dismiss the First Cause of Action be DENIED. To the extent Plaintiff's First Cause of Action relies on retaliation for speech identified above as not being protected speech, I respectfully recommend that this portion of the Defendants' motion to dismiss be GRANTED.

C.     **Retaliation Based on First Amendment Right to Freedom of Association**

The Complaint alleges that Defendants have taken retaliatory action against Plaintiff based on his status as a "union member" and "career firefighter." Defendants assert that Plaintiff has failed to allege facts that create a reasonable inference that Defendants retaliated against Plaintiff based on his status as a union member and career firefighter.

Similar to bringing a freedom of speech claim, "a public employee bringing a freedom of association claim must demonstrate that the association or associational activity at issue touches on a matter of public concern." *Cobb v. Pozzi*, 363 F.3d 89, 107 (2d Cir. 2004). The Second Circuit has held that "there is no doubt that retaliation against public employees solely for their

union activities violates the First Amendment." *Clue v. Johnson*, 179 F.3d 57, 60 (2d Cir. 1999). While union *activities* are protected, "it is far from clear [in the Second Circuit] that union membership by itself touches on a matter of public concern." *Rutherford v. Katonah-Lewisboro Sch. Dist.*, 670 F. Supp. 2d 230, 251 (S.D.N.Y. 2009); *see also Cobb,* 363 F.3d at 107 (2d Cir. 2004) ("We need not decide today whether such membership, by itself, touches on a matter of public concern.").

In the present case, the Court need not determine whether Plaintiff's association touched on a matter of public concern because even assuming *arguendo* that it did, the Court finds that Plaintiff has not sufficiently alleged that any adverse action was taken against him based on his affiliations. The only explicit allegation in the Complaint that an action was taken based solely on Plaintiff's status as a union member and paid firefighter is Plaintiff's allegation that Defendant Gelberg refused to investigate Plaintiff's complaint against Defendant Passaro because Defendant Gelberg's father was a member of the LBVFD. Based on that allegation, Plaintiff states that the LBPD has an "institutional willingness" to overlook misconduct on the part of the LBVFD. Even if these acts were taken to be an adverse employment action, Plaintiff's statements are conclusory and speculative and are not supported by any specific factual allegations which would establish the plausible inference that any Defendant had a retaliatory animus regarding Plaintiff's associations. Furthermore, Plaintiff does not allege any disparate treatment of the other 25 paid firefighters and union members nor does he allege any facts specifically showing hostility on the part of Defendants towards the paid firefighters and union members. While Defendant Passaro's alleged nozzle-switching could have affected all the paid firefighters and union members, Plaintiff has not alleged any facts which would support an

inference that Defendant Passaro was motivated by retaliatory animus against these groups in particular.

For these reasons, I respectfully recommend that Defendants' motion to dismiss Plaintiff's Second Cause of Action for retaliation based on Freedom of Association be GRANTED. Additionally, because Plaintiff is proceeding *pro* se, I respectfully recommend that Plaintiff be given leave to amend the complaint to the extent he believes he can state such a claim beyond mere conclusory allegations and speculation.

### D. Retaliation Based on Right to Petition the Government

The First Amendment provides, in relevant part, that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. "The Supreme Court has described the right to petition government for redress of grievances as 'among the most precious of the liberties safeguarded by the Bill of Rights.'" *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) (quoting *United Mine Workers v. Ill. State Bar Ass'n*, 389 U.S. 217, 222, 88 S.Ct. 353, 356, 19 L.Ed.2d 426 (1967)). The right "applies with equal force to a person's right to seek redress from all branches of government." *Id.* "Indeed, the First Amendment protects not just the right of access to the courts but also 'the rights to complain to public officials and to seek administrative and judicial relief.'" *Hampton Bays Connections, Inc. v. Duffy*, 127 F. Supp. 2d 364, 372 (E.D.N.Y. 2001) (quoting *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994)). When the government obstructs an individual's effort to seek judicial redress, this right is violated. *Berrios v. State Univ. of N.Y. at Stony Brook*, 518 F. Supp. 2d 409, 417 (E.D.N.Y. 2007). The right of access to the courts and to

petition the government includes the right to be free from retaliation for the exercise of such right. *Id.*

Plaintiff's Third Cause of Action alleges that Defendants retaliated against him based on his right to petition the government and redress grievances by "abus[ing] their governmental authority to deter Plaintiff from filing the instant action . . . ." DE 1 ¶ 523. This claim appears to be based on the allegation that during the mediation of Plaintiff's March 2009 disciplinary charges, Defendants offered to drop the disciplinary charges against Plaintiff if he would forfeit his right to bring this action.

"The constitutional right of access [to the courts] is violated where government officials obstruct legitimate efforts to seek judicial redress." *Whalen v. Cnty. of Fulton*, 126 F.3d 400, 406 (2d Cir.1997); *cf. Barrett v. United States*, 798 F.2d 565, 575 (2d Cir.1986) ("Unconstitutional deprivation of a cause of action occurs when government officials thwart vindication of a claim by violating basic principles that enable civil claimants to assert their rights effectively."). "To succeed on an access-to-court claim, a plaintiff must demonstrate actual injury by proving that the denial of access hindered his efforts to pursue a non-frivolous legal claim." *Eberhart v. Crozier*, No. 10-619, 2011 WL 2011533, at *1 (2d Cir. May 24, 2011) (Summary Order) (citing *Lewis v. Casey*, 518 U.S. 343, 349, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996)).

Plaintiff has made no allegations that he was injured by Defendants' settlement offer, nor has he alleged that he was actually hindered in his ability to bring this claim. The Defendants merely offered Plaintiff a deal, by which he would voluntarily be waiving his right to sue. This was not an imposed obstruction to Plaintiff's rights, which is apparent in the fact that Plaintiff could, and did, refuse to accept the offer and has subsequently been able to bring this action. In

his opposition papers, Plaintiff states that Defendants have brought retaliatory disciplinary charges against him since the filing of his Complaint in this action. However, because these allegations are outside the pleadings, they cannot be considered on this motion to dismiss.

In addition to basing this cause of action on his right to bring this lawsuit, Plaintiff states in his opposition brief that he intended this claim also to encompass the letters he wrote to the city regarding overtime staffing and LBVFD misconduct, the filing of the WVPA and DOL complaints, and the filing of an event report with the LBPD. Reading the Complaint liberally in favor of the *pro se* Plaintiff, the Court will consider each of these acts as forming a basis for Plaintiff's right to petition claim.

The Second Circuit has held that the right to petition the government for the redress of grievances is generally subjected to the same constitutional analysis as the right to free speech. *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1059 (2d Cir. 1993). As such, in order to prevail on a right to petition claim, Plaintiff must show that his activity dealt with a matter of public concern. *See Berrios*, 518 F. Supp. 2d at 417; *Bates v. Bigger*, 192 F. Supp. 2d 160, 172 (S.D.N.Y. 2002); *Local 621, S.E.I.U, AFL-CIO v. City of New York*, No. 99-cv-9025, 2002 WL 31151355, at *14 (S.D.N.Y. Sept. 26, 2002). In order to make this inquiry, "the Court must look at the substance of the complaints themselves to determine whether they address a matter of public concern." *Bates*, 192 F. Supp. 2d at 172.

As noted above, the content of the DOL and WVPA complaints did not involve a matter of public concern. As such, the filing of these complaints and the parties' actions regarding these complaints cannot sustain a claim for violation of Plaintiff's right to petition the government. *See Bates*, 192 F. Supp. 2d at 172.

The filing of the event report with the LBPD and the letters written to the City regarding overtime staffing and alleged misconduct did, as discussed above, regard matters of public concern. Furthermore, such acts are an exercise of Plaintiff's right to petition the government. *See Jackson*, 381 F. Supp. 2d 80 (holding that filing criminal complaint with police implicated right to petition government); *Piscottano v. Town of Somers,* 396 F. Supp. 2d 187, 206 (D. Conn. 2005) (finding that letters to government officials constituted a petition to the government); *Rzayeva v. Foster*, No. 97-cv-1385, 2000 WL 565223, at *10 (D. Conn. 2000) (holding that complaints made to police department regarding police conduct implicated right to petition government). As discussed above, Plaintiff has sufficiently alleged that adverse employment action was taken against him in retaliation for these actions. Thus, Plaintiff has sufficiently alleged a claim for retaliation based on his right to petition the government based on his letters and the police report.

For these reasons, I respectfully recommend that Defendants' motion to dismiss Plaintiff's Third Cause of Action for retaliation based on his right to petition the government for redress of grievances be DENIED to the extent it is based on his letters to the city and his filing of a complaint with the LBPD. To the extent Plaintiff's Third Cause of Action is based on retaliation for his filing of the WVPA and DOL complaints or filing of this action, I respectfully recommend that Defendants' motion be GRANTED. I further recommend that Plaintiff be given leave to amend his complaint to include any retaliatory acts he alleges occurred after the filing of the instant complaint provided those allegations conform to the rulings set forth in this Report and Recommendation.

E.    **Equal Protection**

Defendants argue Plaintiff has failed to state a claim that Defendants violated the Equal Protection Clause.  The Equal Protection Clause requires that the government treat all similarly situated people alike.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.E.2d 313 (1985).  Generally, in order to state a claim for an equal protection violation, a plaintiff "must allege that a government actor intentionally discriminated against [him] on the basis of race, national origin or gender."  *Hayden v. Cnty. of Nassau,* 180 F.3d 42, 48 (2d Cir. 1999).  However, even where a plaintiff does not allege that he is a member of one of these protected classes, an equal protection claim can be based on a "class of one" theory.  In order to state a class of one equal protection claim, plaintiff must allege that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Analytical Diagnostic Labs, Inc. v. Kusel,* 626 F.3d 135, 140 (2d Cir. 2010).

Plaintiff alleges that he was treated differently than the other firefighters based mainly on the following events: disciplinary action was taken against Plaintiff based on his altercation with Defendant Passaro, but no disciplinary action was taken against Defendant Passaro; when there were inappropriate internet postings related to another firefighter, Defendants seized the UFA computer, but when Plaintiff received threats over the internet, no action was taken; Plaintiff was denied leave and put under surveillance, but no other firefighter was subject to those actions.

Because Plaintiff does not allege that he was a member of a protected class, his claim must be interpreted as a class of one claim.  As such, this claim is barred by the Supreme Court's decision in *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 128 S.Ct 2146, 170 L.Ed. 2d 975

(2008). In that case, the Supreme Court held that "the class-of-one theory of equal protection does not apply in the public employment context." *Id.*, 128 S.Ct. at 2151. The Court held that "public employees typically have a variety of protections from just the sort of personnel actions about which Engquist complains, but the Equal Protection Clause is not one of them." 128 S.Ct. at 2157. Thus, Plaintiff's equal protection claim based on a class of one theory cannot be maintained. *See Massi v. Flynn*, 353 Fed. Appx. 658 (2d Cir. 2009) (Summary Order) (holding that public employee's equal protection class of one claim was "barred by *Engquist*"); *Gentile v. Nulty*, 769 F. Supp. 2d 573 (S.D.N.Y. 2011) (same).

In addition to pleading a class of one claim, Plaintiff's Complaint can also be read to encompass a selective enforcement equal protection claim. A Plaintiff may prevail on a selective enforcement theory by showing "(1) that he was treated differently from others similarly situated, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Gentile*, 769 F. Supp. 2d at 578 (internal quotations omitted). Selective enforcement is a "murky corner of equal protection law in which there are surprisingly few cases." *Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (internal quotations omitted).

The Supreme Court's opinion in *Engquist* does not state whether it extends to selective enforcement claims brought by public employees. The Second Circuit has not explicitly addressed the issue. However, in *Porr v. Daman*, 299 Fed. Appx. 84 (2d Cir. 2008) (Summary Order), the plaintiff, a public employee, asserted an equal protection claim based on both a class of one theory and a selective enforcement theory. The Second Circuit dismissed the equal

44

protection claim citing *Engquist* and stating that "a public employee does not state a claim under the Equal Protection Clause by alleging that he or she was arbitrarily treated differently from other similarly situated employees unless the different treatment was based on the employee's membership in any particular class." *Id.* at 86. Other courts in this Circuit have similarly held that the Supreme Court's decision in *Engquist* bars a selective enforcement claim by a public employee. *See Terry v. Gary*, No. 08-cv-8127, 2010 WL 4273302, at *4 (S.D.N.Y. Oct. 27, 2010); *Emmerling v. Town of Richmond*, No. 09-cv-6418, 2010 WL 2998911, at *12-13 (W.D.N.Y. July 27, 2010); *Huesser v. Hale*, -- F. Suppp. 2d -- , 2011 WL 1449651, at *15 (D. Conn. 2011). The Court agrees with the reasoning in these cases and finds that *Engquist* dictates that a public employee is barred from bringing a selective enforcement equal protection claim.

For these reasons, I respectfully recommend to Judge Feuerstein that Defendants' motion to dismiss the Fourth Cause of Action be GRANTED.

### F.  Conspiracy to Deprive Plaintiff of Civil Rights under 42 U.S.C § 1985

Plaintiff's Fifth Cause of Action alleges that Defendants have conspired to deprive Plaintiff of his civil rights in violation of 42 U.S.C § 1985(3). Section 1985(3) prohibits two or more individuals from conspiring to deprive any person or class of persons "of the equal protection of the laws, or of equal privileges and immunities under the laws . . . ." 42 U.S.C. § 1985(3). To allege a violation, a plaintiff must claim: (1) a conspiracy; (2) for the purpose of depriving any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a United States citizen. *See Emmons v. City Univ. of N.Y.*, 2010 WL 2246413, *14 (E.D.N.Y. June 2,

2010) (citing *United Bhd. of Carpenters and Joiners of Am. Local 610 v. Scott*, 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983).

"Moreover, a § 1985(3) violation must be motivated by some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.* (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971) (internal quotation marks omitted). "In other words, the intended victims must be victims not because of any personal malice the conspirators have toward them, but because of their membership in or affiliation with a particular class." *Id.* (citing *Scott*, 463 U.S. at 850). The Supreme Court has "strictly construed this class-based animus requirement of Section 1985(3)." *Robinson v. Allstate*, 706 F. Supp. 2d 320, 328 (W.D.N.Y. 2010) (citing *Katz v. Klehammer,* 902 F.2d 204, 208 (2d Cir. 1990). In this way, "a 1985 claim is narrower than a 1983 claim." *Schwasnick v. Fields*, No. 08-cv-4759, 2010 WL 2679935, at *10 (E.D.N.Y. June 30, 2010).

The "class" that is the subject of the allegedly invidious discrimination "cannot be defined merely as the class of alleged victims . . . Instead, the discriminatory animus referred to must be based upon racial or other class-based motive." *Vertical Broad., Inc. v. Town of Southampton*, 84 F. Supp. 2d 379, 390 (E.D.N.Y. 2000) (citations omitted). In addition, "Section 1985(3) does not reach conspiracies motivated by bias towards others on account of their *economic* views, status, or activities." *423 S. Salina St., Inc. v. City of Syracuse*, 724 F.2d 26, 27 (2d Cir. 1983) (internal quotation omitted).

Plaintiff does not allege any racial or other invidious discrimination. Instead, the Complaint states that Plaintiff's § 1985 claim is based on his status as a union member and paid firefighter. However, the Supreme Court has explicitly held that union membership and

economic position are not protected classes for § 1985 purposes. *Scott*, 463 U.S. at 838-39. In

*Scott,* the Supreme Court stated that:

> if anti-union, anti-nonunion, or anti-employer biases represent the kinds of animus that trigger § 1985(3), there would be little basis for concluding that the statute did not provide a cause of action in a variety of other situations where one economic group is pitted against another, each having the intent of injuring or destroying the economic health of the other. We think that such a construction of the statute . . . should be eschewed and that group actions generally resting on economic motivations should be deemed beyond the reach of § 1985(3).

*Id.* at 839*; see also Rodonich v. House Wreckers Union Local 95 of Laborers Int'l Union*, No.

82-cv-5583, 1983 WL 31117, at *3 (S.D.N.Y. Apr. 15, 1983) ("To prove their section 1985(3)

claim, defendants must show that they are members of an historically disadvantaged

minority. . . . Union members are not such a minority.") (internal quotation omitted);

*Amalgamated Clothing & Textile Workers Union v. J.P. Stevens & Co.*, 475 F. Supp. 482, 492

(S.D.N.Y. 1979) (*vacated on other grounds*) (dismissing § 1985 claim based on animus toward

unions); *St. George v. Mak*, 842 F. Supp. 625, 636 (D. Conn. 1993) (same). As such, I

respectfully recommend that Defendants' motion to dismiss Plaintiff's Fifth Cause of Action be

GRANTED.

### G. Failure to Prevent Deprivation of Civil Rights in Violation of § 1986

Section 1986 provides a cause of action against anyone who, having knowledge that any

of the wrongs conspired to be done and mentioned in § 1985 are about to be committed and

having power to prevent or aid, neglects to do so. *See* 42 U.S.C. § 1986. Thus, a § 1986 claim

must be predicated upon a valid § 1985 claim. *See Mian v. Donaldson, Lufkin & Jenrette Sec.*

*Corp.*, *7 F.3d 1085, 1088 (2d Cir. 1993); Volunteer Fire Ass'n of Tappan, Inc. v. County of*

*Rockland*, No. 09-cv-4622, 2010 WL 4968247, at *9 (S.D.N.Y. Nov. 24, 2010); *Rose v. Bethel*,

No. 03-cv-1241, 2007 WL 2476389, at *16 (S.D.N.Y. Aug. 29, 2007).

Since Plaintiff fails to state a claim under Section 1985, he likewise fails to state a claim

under Section 1986.  Therefore, I respectfully recommend that Defendants' motion to dismiss

Plaintiff's Sixth Cause of Action be GRANTED.

### F.      State Law Claims

The Complaint includes state law claims for violation of the New York State Constitution

and the New York State Labor Law as well as two claims of  breach of contract.  Defendants

argue that because all federal claims should be dismissed, the pendant state law claims should

also be dismissed.  However, because the Court finds that some of Plaintiff's claims survive the

motion to dismiss, the Court retains pendent jurisdiction over the state law claims.  *See United

Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725 (1966)*.*  As such, I respectfully recommend

that Defendants' motion to dismiss the state law claims be DENIED.

### G.      Qualified Immunity

Defendants argue that all of the individual Defendants are protected by the doctrine of

qualified immunity.  DE 22-2 at 22.  Plaintiff argues that it is too early in the litigation to

determine whether the individual Defendants should be protected by qualified immunity because

not enough facts are available.  DE 23 at 11.

"[G]overnment officials performing discretionary functions generally are shielded from

liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald,*

457 U.S. 800, 818 (1982).  "If the right is so generalized that is application in the factual context

of the case is subject to doubt, the immunity defense may bar action against the official."

*Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir. 1991). Therefore, the constitutional right and relevant law the officials are alleged to have violated must be "clearly established in a more particularized, and hence more relevant sense." *Anderson v Creighton,* 483 U.S. 635, 640 (1987).

However, "[e]ven when a plaintiff's federal rights are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified or good faith immunity might still be available as a bar to plaintiff's suit if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky,* 929 F.2d at 925. Because qualified immunity is an affirmative defense, Defendants bear the burden of showing the objective reasonableness of the acts in question. *See Tellier v. Fields*, 280 F.3d 69, 84 (2d Cir. 2000).

"Since qualified immunity is an immunity from suit rather than mere defense to liability, a court 'ordinarily' should decide the issue 'long before trial,' 'at the earliest possible stage of litigation." *Dasher v. Hughes,* No. 95-cv-3913, 2000 WL 726865 at *7 (S.D.N.Y.) (quoting *Hunter v. Bryant,* 502 U.S. 224 (1991)). However, in many instances, facts concerning the availability of immunity are disputed or unavailable. *See Dasher,* 2000 WL 726865 at *7; *see also White v. Frank,* 855 F.2d 956, 958, 962 (2d Cir. 1988). Furthermore, "a defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route. Not only must the facts supporting the defense appear on the face of the complaint, but as with all Rule 12(b)(6) motions, the motion may be granted only where it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim that would entitle him to relief."

*McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir. 2004) (internal citations and quotations omitted).

Thus, a qualified immunity defense "faces a formidable hurdle when advanced" on a motion to

dismiss. *Id.* at 434.

Defendants do not argue that Plaintiff's rights were not clearly established, nor do they

argue that Defendants had an objectively reasonable motivation for their actions. Instead,

Defendants merely state that they are entitled to qualified immunity because the Complaint "fails

to sufficiently allege any violation of a protected right." DE 22-1 at 23. However, as discussed

above, the Court finds that Plaintiff has adequately pled portions of his First Amendment claim.

Thus, Defendants' argument fails.

Furthermore, Plaintiff's right to freedom of speech, even as a government employee, was

clearly established during the time the underlying acts occurred. For a right to be "clearly

established" for purposes of qualified immunity, "it is sufficient if decisions of the Supreme

Court or of the appropriate circuit have defined the contours of the right with reasonable

specificity." *Russell v. Coughlin*, 910 F.2d 75, 78 (2d Cir. 1990); *see also Anderson*, 483 U.S. at

640, 107 S.Ct. 3034. Furthermore, a law is considered "clearly established if the circuit's

decisions clearly foreshadow a particular ruling on the issue." *Varrone v. Bilotti*, 123 F.3d 75, 79

(2d Cir. 1997) (internal quotation omitted). As discussed above, a public employee's right to

free speech addressing matters of public concern was clearly established prior to 2008 when the

underlying events began. *See, e.g., Rao v. New York City Health & Hosps. Corp.*, 905 F. Supp.

1236, 1247 (S.D.N.Y. 1995) (holding that a public employee's right to free speech on matter of

public concern was well established as far back as 1987).

50

In addition, Defendants have not met their burden of showing that their actions were objectively reasonable. The Court has already stated that for the purposes of this motion, a plausible inference can be drawn that Defendants were motivated by a retaliatory animus. Defendants have not suggested any alternative basis for their actions that would preclude that inference. The Second Circuit has held that "an employer's actual (subjective) motivation in taking adverse action against the employee is not irrelevant in a qualified immunity inquiry." *Delbene*, 2001 WL 170801, at *13 (citing *Sheppard v. Beerman*, 94 F.3d 823, 828 (2d Cir. 1996)). Thus, there is not enough information available at this stage of the litigation to determine whether Defendants are shielded by qualified immunity.

I respectfully recommend that Defendants' motion to dismiss based on qualified immunity be DENIED.

### H. Failure to State a Claim Against Individual Defendants

Defendants move to dismiss the Complaint against Defendants Hirsch, Klein, Agostisi, Kemins, Fraser, McLaughlin, Gelberg, and Radin.[9] Defendants allege that these eight individual Defendants did not have any individual involvement in the alleged constitutional violations and thus cannot be held liable under § 1983.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004) (internal quotations and citation omitted); *see also*

---

[9] In a footnote in their motion to dismiss, Defendants suggest that Plaintiff is a "vexatious" litigant and should be enjoined from instituting any further actions in this Court. While Plaintiff's Complaint may be overly broad, I do not see any evidence of Plaintiff bringing any repeated and patently frivolous actions. An injunction at this point is unwarranted.

*Platt v. Incorporated Village of Southampton*, 391 Fed. Appx. 62, 65 (2d Cir. 2010); *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254–5 (2d Cir. 2001). "Personal involvement" may be established by evidence of direct participation by the plaintiff in the challenged conduct, or by evidence of a supervisory official's "(1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 753 (2d Cir. 2003); *see also Rolon v. Ward*, 345 Fed. Appx. 608, 611 (2d Cir. 2009). "The fact that [a defendant] was in a high position of authority is an insufficient basis for the imposition of personal liability." *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir. 1989); *see also Back*, 365 F.3d at 127. A complaint based on a violation under §1983 that does not allege the personal involvement of a defendant fails a matter of law. *See Rosa R. v. Connelly*, 889 F.2d 435, 437 (2d Cir. 1989); *Alfaro Motors. Inc. v. Ward*, 814 F.2d 883, 886 (2d Cir. 1987); *see also Johnson v. Barney*, 360 Fed. Appx. 199, 201 (2d Cir. 2010) (finding that the plaintiff's claims against the Superintendent failed as a matter of law because the plaintiff did not sufficiently allege his personal involvement in the alleged constitutional violation).

The alleged violation of Plaintiff's First Amendment rights arises from the allegedly retaliatory actions taken against him. These include, but may not be limited to, the disciplinary actions, the demotion, the unpaid suspension, and the docking of Plaintiff's pay. If the individual Defendants are not alleged to have had personal involvement in the retaliatory actions, they cannot be held liable.

52

The Complaint describes Defendant Hirsch's involvement in the underlying incidents to be:  (i) that she was the "Workplace Security Coordinator" under the WVPA; (ii) that she was responsible for investigating Plaintiff's WVPA complaints which included meeting with Plaintiff and his union representative; and (iii) that she knew of the internet threats made against Plaintiff. Plaintiff does not allege that Defendant Hirsch had any involvement in, or knowledge of, the allegedly adverse employment actions taken against him.  Nor is there any allegation that Defendant Hirsch acted in a supervisory role to any of the other Defendants which would establish personal involvement under the *Hayut* test.  As such, Plaintiff has failed to plead sufficient facts to allow a plausible inference that Defendant Hirsch violated his Constitutional rights.

The Complaint describes Defendant Klein's involvement in the underlying incidents to be that:  (i) he ordered Plaintiff to seize the UFA computer when threatening internet posts were made from it; (ii) he informed Plaintiff that any action taken under the WVPA was discretionary; and (iii) he sent a letter to the DOL stating that Plaintiff's DOL complaint was unfounded. Plaintiff does not allege that Defendant Klein had any involvement in, or knowledge of, the allegedly adverse employment actions taken against Plaintiff.  Nor is there any allegation that Defendant Klein acted in a supervisory role to any of the other Defendants which would establish personal involvement under the *Hayut* test.  As such, Plaintiff has failed to plead sufficient facts to allow a plausible inference that Defendant Klein violated his Constitutional rights.

The involvement of Defendant Radin is limited to his presence at the scene of the February 11, 2009 incident.  Defendant Gelberg is alleged to have been at the scene and refused to follow-up on Plaintiff's complaints about Defendant Passaro.  Defendant Gelberg is further

alleged to have taken Plaintiff's statement at the police station, but not to have recorded it accurately. Defendant does not allege that either Defendant Gelberg or Defendant Radin had any involvement in, or knowledge of, the allegedly adverse employment actions taken against Plaintiff. Nor is there any allegation that Defendants Gelberg and Radin acted in a supervisory role to any of the other Defendants that would establish personal involvement under the *Hayut* test. As such, Plaintiff has failed to plead sufficient facts to allow a plausible inference that Defendants Gelberg and Radin violated his Constitutional rights.

Defendant Agostisi was present at the meeting where Plaintiff was told to seize the UFA computer. Plaintiff also informed Defendant Agostisi when Defendant Theofan's memorandum was "improperly posted" in the fire headquarters, whereupon Defendant Agostisi "declined to comment." Plaintiff also informed Defendant Agostisi when Plaintiff received internet threats. Plaintiff does not allege that Defendant Agostisi had any involvement in, or knowledge of, the allegedly adverse employment actions taken against Plaintiff. Nor is there any allegation that Defendant Agostisi acted in a supervisory role to any of the other Defendants which would establish personal involvement under the *Hayut* test. As such, Plaintiff has failed to plead sufficient facts to allow a plausible inference that Defendant Agostisi violated his Constitutional rights.

The only allegations against Defendant McLaughlin are that he "intervened" on Lieutenant Alfasi's behalf regarding the Christmas Eve staffing controversy and that he subsequently yelled at Plaintiff over the telephone. These allegations are not sufficient to establish that Defendant McLaughlin had any direct involvement or supervisory involvement in the alleged violations of Plaintiff's constitutional rights.

The Complaint states that Defendant Kemins was the First Deputy Fire Commissioner during the time of the underlying events. However, Plaintiff alleges that Defendant Kemins was the "*de facto* Fire Commissioner due to his employment in Defendant City's Building Department." DE 1 ¶ 398. As such, Plaintiff states that Defendant Kemins makes "all day-to-day decisions involving the LBFD, including, on information and belief, Defendants [sic] disciplinary actions involving Plaintiff." *Id.* ¶ 400. Plaintiff does to not allege any specific facts to support his conclusory assertions that Defendant Kemins acted as the *de facto* Commissioner or that he was responsible for determining whether disciplinary actions were brought. Such unsupported conclusory allegations do not warrant a presumption of truthfulness on a motion to dismiss. As such, Plaintiff has failed to sufficiently plead that Defendant Kemins had any personal involvement in the alleged Constitutional violations.

The allegations against Defendant Fraser are that he received a memorandum from Plaintiff regarding the scheduled training session to which Defendant Fraser did not respond. Plaintiff also states that he left a copy of one of WVPA complaints in Defendant Fraser's mailbox in fire headquarters. While Defendant Fraser's position as Fire Commissioner might put him in a supervisory role, Plaintiff has not alleged any facts that would support an inference that Defendant Fraser knew of any misconduct by subordinates, created a policy fostering misconduct, was grossly negligent in supervising subordinates, or exhibited deliberate indifference to the rights of others. Nor does Plaintiff make any factual allegations which would support an inference that Defendant Fraser was directly involved in any violation of Plaintiff's constitutional rights.

As such, I respectfully recommend to Judge Feuerstein that Defendants' motion to

dismiss the eight individual defendants listed above be GRANTED. However, I further recommend that Plaintiff be permitted to amend his Complaint to the extent he can make factual allegations which would support an inference that these Defendants were personally involved in the alleged deprivation of his rights.

## V. CONCLUSION

For the reasons discussed above, I respectfully recommend to Judge Feuerstein that Defendants' motion to dismiss be GRANTED as to the Second, Fourth, Fifth and Sixth Causes of Action, and that the motion to dismiss Defendants Hirsch, Klein, Agostisi, Kemins, Fraser, McLaughlin, Gelberg, and Radin be GRANTED. I further recommend that Defendants' motion to dismiss be DENIED as to the First and Third Causes of Action to the extent they are based on protected speech or activity. I also recommend that Plaintiff be given leave to amend his Complaint as discussed above.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6(a) and (e). Such objections shall be filed with the Clerk of the Court via ECF, except in the case of a party proceeding *pro se.* Pro Se Plaintiff Jay Gusler must file his objections in writing with the Clerk of the Court within the prescribed time period noted above. A courtesy copy of any objections filed is to be sent to the chambers of the Honorable Sandra J. Feuerstein, and to my chambers as well. Any requests for an extension of time for filing objections must be directed to Judge

Feuerstein prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997), cert. denied, 522 U.S. 883, 118 S.Ct. 211, 139 L.Ed.2d 147 (1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Counsel for Defendants is directed to serve a copy of this Report and Recommendation upon the Plaintiff *pro se* forthwith and to file proof of service on ECF.

**SO ORDERED.**

Dated: Central Islip, New York
      August 15, 2011

/s/ A. Kathleen Tomlinson
A. KATHLEEN TOMLINSON
U.S. Magistrate Judge